UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROBIN L. ROOT,

       Petitioner,

v.                           CASE NO. 2:21-CV-11113
                             HON. DENISE PAGE HOOD

JEREMY HOWARD,

       Respondent.
_____/

**OPINION & ORDER DENYING THE PETITION FOR A WRIT OF
HABEAS CORPUS, DENYING A CERTIFICATE OF APPEALABILITY,
& DENYING LEAVE TO PROCEED IN FORMA PAUPERIS ON APPEAL**

I.    Introduction

      Michigan prisoner Robin L. Root ("Petitioner"), through counsel, has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 asserting that she is being held in custody in violation of her constitutional rights. ECF No. 1. Petitioner was convicted of second-degree murder, Mich. Comp. Laws § 750.317, following a jury trial in the Kent County Circuit Court. She was sentenced to 25 to 50 years in prison in 2018. In her pleadings, she challenges the admission of her inculpatory statements to police. For the reasons stated herein, the Court denies the habeas petition. The Court also denies a certificate of appealability and denies leave to

proceed in forma pauperis on appeal.

## II.    Facts and Procedural History

Petitioner's conviction arises from the death of Janna Kelly in Grand

Rapids, Michigan in 2007.   The Michigan Court of Appeals described the

underlying facts, which are presumed correct on habeas review, *see* 28

U.S.C. § 2254(e)(1); *Wagner v. Smith*, 581 F.3d 410, 413 (6th Cir. 2009), as

follows:

> On the evening of December 4, 2007, Janna Kelly went missing from her Grand Rapids, Michigan, home. Her daughter and boss became concerned, and a police investigation ensued after Kelly's purse, wallet, and a fleece jacket were discovered abandoned at a local car wash the next day. Police also discovered Kelly's car parked in a neighborhood within walking distance of Kelly's home. Officers found blood on the car and on the jacket; test results showed that it belonged to an unidentified female donor. Officers also obtained Kelly's phone records and found that her phone had traveled from Grand Rapids to a location in Ottawa County on December 5, 2007.

> In the course of looking for her mother, Kelly's daughter searched her mother's house and discovered that Root had called Kelly's home phone on the night of her disappearance. The daughter also discovered a note Kelly had written indicating that she was arranging to have Root pay a judgment that Kelly obtained against Root after she evicted Root from the duplex that she owned. The duplex was located behind Kelly's home.

> Detective Tim DeVries with the Grand Rapids Police Department interviewed Root on Thursday, December 6, 2007. At the request of police, Root and her live-in male companion drove to the police

station to be interviewed. Root's interview was recorded. At the time of the interview, Root was living in a different rental home located behind Kelly's house. Root acknowledged that when the police first approached her house that day, she told them they were probably there to talk with her about her ex-landlord. She explained that she saw the news story on television that evening and recognized Kelly immediately. Root stated that she had last seen Kelly the Saturday before and acknowledged that it was in regard to money she owed Kelly for unpaid rent, for which Kelly had obtained a judgment. Root described her personal encounters with Kelly on Wednesday, November 28 and Saturday, December 1, 2007, both occurring at Kelly's house. She was very detailed in answering questions concerning her whereabouts in the days leading up to Kelly's disappearance, including where she was when making two telephone calls to Kelly—at 5:02 p.m. and at 6:15 p.m.—on Tuesday, December 4, 2007, the evening Kelly disappeared. However, when asked about her activities on Wednesday, December 5, 2007, which was the day after Kelly's disappearance and only one day prior to the police interview, she took a long time to answer and became extremely vague. She stated that she was home for the most part, but that she was also over at her daughter's house and ran some errands. When asked about what errands she ran, she stated that one of them included getting gas. When asked what gas station she went to, Root said she could not recall, but that it was probably one of two that she typically uses. She stated that the farthest she drove that day was to pick up her son at his school, Forest Hills Central, which is located in Cascade, Michigan. When asked if she ever gets up to Grand Haven, Hudsonville, Jenison, or Zeeland, she said no, "I don't try and go that far" and that there was no reason for either her or her male companion to be out that way. Root voluntarily provided a DNA sample; it was not immediately sent to the lab for testing.

In March 2008, a surveyor discovered Kelly's remains while surveying a property in Grand Haven Township. Testimony and evidence established that someone had stripped Kelly of her

clothing, dumped her in a secluded area, and set her on fire using gasoline, with charring most prominent around her face and upper body. There was also evidence that her mouth and limbs had been duct taped. Due to the partial burning, exposure to the environment, and animal activity, the medical examiner could not determine whether the perpetrator had asphyxiated Kelly. The medical examiner determined that Kelly died from homicide by unspecified means.

More than six years passed without discovering who killed Kelly. In 2014, cold case detectives Venus Repper and Kreg Brace with the Ottawa County Sheriff's Office reviewed Kelly's case. Repper noticed that some DNA profiles had not been sent to the laboratory that tested the blood from Kelly's car and the jacket found at the carwash. She contacted DeVries about her discovery and the additional samples were sent to the lab. The results of the testing showed that the blood matched Root's DNA profile. DeVries also analyzed cell phone data and learned that Root's cell phone had moved along the same path at the same time that Kelly's cell phone had traveled west from Grand Rapids to Grand Haven on Wednesday, December 5, 2007. Root's cell phone stopped for a period of time in the same area where Kelly's remains were later found.

Repper and Brace contacted Root and visited her home on April 21, 2015, conducting a short, audiotaped interview, and arranging for her to visit the Ottawa County Sheriff's Office in West Olive the next day for a formal interview. The detectives did not inform Root about the DNA and cell phone evidence they had obtained. The following day, Root drove herself to the Sheriff's Office, where, in another audiotaped interview, she answered casual questions for 90 minutes before cutting the interview short in order to pick up her granddaughters from school. The interview ended before any detailed discussion of Root's whereabouts and activities at the time of Kelly's disappearance. Root arranged with detectives to complete the interview on another day. On April 27, 2015, Root again drove herself to the Sheriff's Office, where her

4

interview with detectives began at 11:44 a.m. and lasted for approximately six hours. The interview was videotaped. After several hours of questioning, the detectives extracted from Root a confession. Root unsuccessfully sought to suppress the confession from being admitted as evidence at trial.

At her trial, Root conceded that she killed Kelly and dumped her remains in Ottawa County, but she argued that Kelly's death was an accident and that she covered up the crime out of panic. As already noted, the jury rejected Root's defense and found her guilty. [*People v. Root*, unpublished per curiam opinion of the Court of Appeals, issued August 31, 2017 (Docket No. 331123), p. 1-2.]

This Court vacated defendant's first-degree murder conviction finding that portions of her statement to police were inadmissible because they were obtained in violation of her *Miranda* rights. *Root*, unpub. op. at 3-15. On remand to the trial court, defendant was again tried before a jury, and the portions of her statement to police that this Court had determined were inadmissible were not submitted to the jury. She was convicted of second-degree murder and thereafter sentenced to 25 to 50 years in prison.

*People v. Root*, No. 346164, 2020 WL 1816009, *1-2 (Mich. Ct. App. Apr. 9, 2020) (footnote citation omitted).

Following her conviction and sentencing (after her second trial), Petitioner filed an appeal of right with the Michigan Court of Appeals raising the same claim presented on habeas review, as well as two sentencing claims.   The court denied relief on those claims and affirmed her conviction and sentence.   *Id.* at *3-8.   Petitioner then filed an application for leave to

appeal with the Michigan Supreme Court, which was denied in a standard order. *People v. Root*, 506 Mich. 892, 947 N.W.2d 818 (2020).

Petitioner thereafter filed her federal habeas petition. She raises the following claim:

> The Michigan appellate courts erroneously affirmed the trial court's denial of [her] motion to suppress her April 27, 2015 inculpatory statements to police investigators, contrary to [her] Fourth and Fifth Amendment federal constitutional rights.

ECF No. 1, PageID.2; ECF No. 2, PageID.19. Respondent filed an answer to the petition contending that it should be denied. ECF No. 7. Petitioner filed a reply to that answer. ECF No. 9.

## III. Standard of Review

Federal law imposes the following standard of review for habeas cases brought by state prisoners:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an

6

unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

28 U.S.C. § 2254(d).

"A state court's decision is 'contrary to' ... clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [that] precedent.'"  *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-406 (2000)); *see also Bell v. Cone*, 535 U.S. 685, 694 (2002).

"[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts of petitioner's case."  *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694.   However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous.   The state court's application must have been 'objectively unreasonable.'"  *Wiggins*,

539 U.S. at 520-521 (citations omitted); *see also Williams*, 529 U.S. at 409.

"AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' and 'demands that state-court decisions be given the benefit of the doubt.'" *Renico v. Lett*, 559 U.S. 766, 773 (2010) (quoting *Lindh*, 521 U.S. at 333, n. 7; *Woodford v. Viscotti*, 537 U.S. 19, 24 (2002) (per curiam)).

A state court's determination that a claim lacks merit "precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id*. (citing *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003)). Pursuant to § 2254(d), "a habeas court must determine what arguments or theories supported or ... could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the Supreme Court. *Id*. In order to obtain federal habeas relief, a state prisoner must show that the state court's rejection of a claim "was so lacking in justification that there

was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id*.; *see also White v. Woodall*, 572 U.S. 415, 419-420 (2014). A habeas petitioner cannot prevail as long as it is within the "realm of possibility" that fairminded jurists could find the state court decision reasonable. *Woods v. Etherton*, 576 U.S. 113, 118 (2016); *Woods v. Donald*, 575 U.S. 312, 316 (2015).

Section 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with clearly established federal law as determined by the Supreme Court at the time the state court renders its decision. *Williams*, 529 U.S. at 412; *see also Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009) (noting that the Supreme Court "has held on numerous occasions that it is not 'an unreasonable application of clearly established Federal law' for a state court to decline to apply a specific legal rule that has not been squarely established by this Court") (quoting *Wright v. Van Patten*, 552 U.S. 120, 125-126 (2008) (per curiam)); *Lockyer*, 538 U.S. at 71-72. Section 2254(d) "does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'" *Harrington*, 562 U.S. at 100. Furthermore, it "does not require citation of [Supreme Court] cases–indeed, it does not even

require awareness of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002); *see also Mitchell*, 540 U.S. at 16.

The requirements of clearly established law are determined solely by Supreme Court precedent. "[C]ircuit precedent does not constitute 'clearly established Federal law as determined by the Supreme Court'" and it cannot provide the basis for federal habeas relief. *Parker v. Matthews*, 567 U.S. 37, 48-49 (2012) (per curiam); *see also Lopez v. Smith*, 574 U.S. 1, 2 (2014) (per curiam). The decisions of lower federal courts, however, may be useful in assessing the reasonableness of the state court's resolution of an issue. *Stewart v. Erwin*, 503 F.3d 488, 493 (6th Cir. 2007) (citing *Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003)); *Dickens v. Jones*, 203 F. Supp. 354, 359 (E.D. Mich. 2002).

Lastly, a state court's factual determinations are presumed correct on federal habeas review. 28 U.S.C. § 2254(e)(1). A petitioner may rebut this presumption only with clear and convincing evidence. *Warren v. Smith*, 161 F.3d 358, 360-361 (6th Cir. 1998). Habeas review is "limited to the record that was before the state court." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

## IV.  Analysis

Petitioner asserts that she is entitled to habeas relief because the trial court erred in refusing to suppress her April 27, 2015 inculpatory statements to police investigators in violation of her Fourth and Fifth Amendment rights. Specifically, she argues that those statements should have been suppressed because they were the product of an illegal search and seizure of her cell phone records.   Respondent contends that this claim is not cognizable on habeas review, that it is procedurally defaulted in part, and that it lacks merit.

The Michigan Court of Appeals described the relevant facts for this claim, which, again, are presumed correct on habeas review, as follows:

> Shortly after Kelly disappeared in December 2007, the police, in an effort to locate Kelly, obtained the cell-site location information (CSLI) related to her cell phone. From this information, the police were able to determine that on the morning after her disappearance, Kelly's cell phone was located near her home because the phone connected with a tower near her home. However, at 11:22 a.m. that day, Kelly's cell phone connected with a cell site in Hudsonville, and at 12:03 p.m., her cell phone connected with a cell site in West Olive, near where her body was later discovered in March 2008.
>
> On September 23, 2009, the police obtained information from certain phone companies from what is known as a "tower dump." Although the officers obtained a court order to collect the information, they did not obtain a warrant. Unlike CSLI related to a specific cell phone, a tower dump is a download of information of all the devices that connected to a particular cell site during a

11

particular time period. In this case, police obtained a tower dump for every phone number that connected to the cell phone tower near the victim's home and a tower dump for every phone number that connected to the cell tower near the location where her body was discovered during the relevant times. However, at that time the police did not decipher the information from the tower dump; the lead detective investigating the murder testified that at that time the police department had neither the software nor the expertise to do so.

Six years later, after detectives reviewing the police investigation as a cold case discovered that defendant's DNA matched the DNA found on the victim's car and jacket, police deciphered the CSLI obtained from the 2009 tower dump and found that defendant's cell phone had been in the area of the victim's cell phone at the time of her murder and the next day traveled at the same time as the victim's phone to the area where the victim's body was later discovered. In January 2015, police obtained the billing records for defendant's cell phone for dates that included December 5, 2007, again with a court order but without obtaining a warrant.

In April 2015, the police again interviewed defendant; during the interview, the detectives confronted defendant with the information that they had gathered from the tower dump that her cell phone had been in the location of the victim's cell phone at the time she was murdered, and the next day defendant's cell phone moved at the same time as the victim's cell phone to the location where the victim's body was later discovered. Police also told defendant that her cell phone billing records indicated that she had called Billy Graham's hotline on December 7, 2007, and that they believed she made this call because she felt guilty for killing Kelly. Defendant eventually confessed to killing the victim and moving her body to the West Olive location.

At trial, defendant moved to suppress the statements that she made to police after the detectives confronted her with

Case 2:21-cv-11113-DPH-CI   ECF No. 10, PageID.1670   Filed 07/09/24   Page 13 of 23

information they had gleaned from the tower dump. Defendant argued that she made the statements after police confronted her with evidence police obtained without a search warrant, and therefore her statements were the product of a warrantless search and subject to suppression. Relying on a then newly-released Supreme Court decision in *Carpenter v. United States*, _ U.S. _; 138 S. Ct. 2206, 2221; 201 L. Ed. 2d 507 (2018), defendant argued that the officers were required to obtain a search warrant before obtaining her CSLI. Defendant did not contend, however, that the statements were subject to suppression because information was gathered from her billing records about the call to the Billy Graham hotline.

The trial court denied the motion to suppress. The trial court observed that *Carpenter* involved CSLI obtained regarding a particular phone number and did not involve locational information ascertained through a tower dump of all numbers connecting with a cell tower at a particular time. The trial court also noted that there was no indication that the newly-announced warrant requirement of *Carpenter* was to be applied retroactively to invalidate earlier searches. The trial court therefore permitted the introduction of defendant's statements to police made after she learned that they had obtained the locational information.

Root, 2020 WL 1816009 at *3-4 (explanatory footnotes omitted).

The Michigan Court of Appeals then discussed the legal issues, found no constitutional violation, and denied relief on this claim.  The court explained:

On appeal, defendant contends that the police obtained the CSLI regarding her cell phone without a warrant in violation of the Fourth Amendment. She argues that the trial court therefore erred in denying her motion to suppress statements she made to police after she was confronted with the improperly seized CSLI.

13

Defendant also suggests that the trial court should have suppressed her statements because police obtained her cell phone billing information without a warrant in January 2015 and used that information to learn that she called Billy Graham's hotline on December 7, 2007, then used the information, together with the CSLI information, during the April 2015 interview to obtain her confession.

This Court reviews de novo constitutional issues and the application of the exclusionary rule. *People v. Campbell*, _ Mich. App. _, _; _ N.W.2d _ (2019) (Docket No. 344078); slip op. at 2. When reviewing a trial court's ruling on a motion to suppress, we review the trial court's factual findings for clear error and review de novo the trial court's interpretation of the law or application of a constitutional standard. *People v. Tanner*, 496 Mich. 199, 206; 853 N.W.2d 653 (2014). With regard to the unpreserved challenge to the use of evidence obtained from defendant's cell phone billing records, defendant failed to properly preserve this issue by specifically raising this issue before the trial court, and we therefore review the issue for plain error affecting defendant's substantial rights. *See People v. Carines*, 460 Mich. 750, 763; 597 N.W.2d 130 (1999).

The United States and Michigan Constitutions both guarantee the right of citizens to be free from unreasonable searches and seizures. *See* U.S. Const., Am. IV; Const. 1963, art. 1, § 11; *People v. Slaughter*, 489 Mich. 302, 310; 803 N.W.2d 171 (2011). A search occurs when "the government intrudes on an individual's reasonable, or justifiable, expectation of privacy," and property is seized when "there is some meaningful interference with an individual's possessory interest in that property." *People v. Woodard*, 321 Mich. App. 377, 383; 909 N.W.2d 299 (2017). The reasonableness of a search and seizure is fact specific and is determined by examining the totality of the circumstances. *People v. Williams*, 472 Mich. 308, 314; 696 N.W.2d 636 (2005). To comply with the prohibition against unreasonable searches and seizures, the police must establish

14

probable cause and that they either obtained a warrant to search or that the search fell within an exception to the warrant requirement. *People v. Kazmierczak*, 461 Mich. 411, 418; 605 N.W.2d 667 (2000).

Generally, evidence seized in violation of the constitutional prohibition against unreasonable searches and seizures must be excluded from evidence at trial. *People v. Mahdi*, 317 Mich. App. 446, 458; 894 N.W.2d 732 (2016). The exclusionary rule was judicially created to protect the Fourth Amendment right to be free of unreasonable searches and seizures by barring admission into evidence of "materials seized and observations made during an unconstitutional search." *People Hawkins*, 468 Mich. 488, 498-499; 668 N.W.2d 602 (2003).

However, in *People v. Goldston*, 470 Mich. 523, 526; 682 N.W.2d 479 (2004), our Supreme Court adopted the good-faith exception to the exclusionary rule, stating that "[t]he purpose of the exclusionary rule is to deter police misconduct. That purpose would not be furthered by excluding evidence that the police recovered in objective, good-faith reliance on a search warrant." Thus, the "application of the exclusionary rule is inappropriate in the absence of governmental misconduct." *People v. Frazier*, 478 Mich. 231, 250; 733 N.W.2d 713 (2007). Rather, "[t]he deterrent purpose of the exclusionary rule necessarily assumes that the police have engaged in willful, or at the very least negligent, conduct which has deprived the defendant of some right .... Where the official action was pursued in complete good faith, however, the deterrence rationale loses much of its force." *Michigan v. Tucker*, 417 U.S. 433, 447; 94 S. Ct. 2357; 41 L. Ed. 2d 182 (1974).

In *Carpenter*, law enforcement officers obtained CSLI pursuant to court orders issued under the Stored Communications Act, which requires law enforcement only to show "reasonable grounds" for believing that the CSLI was "relevant and material to an ongoing investigation" to obtain a court order for the information. *Carpenter*, _ U.S. at _; 138 S. Ct. at 2212; 18 USC

§ 2703(d). In *Carpenter*, the police had obtained the CSLI related specifically to the defendant's cell phone (not from a "tower dump") by obtaining a court order, but did not obtain a warrant for the information. The Court in *Carpenter* held that the locational information police obtained regarding the defendant's cell phone was obtained as the product of a search, observing that "an individual maintains a legitimate expectation of privacy in the record of his physical movements as captured through CSLI." *Id*. at _; 138 S. Ct. at 2217. The Court therefore determined that a court order supported by "reasonable grounds" was not sufficient to acquire an individual's CSLI, and instead "the Government must generally obtain a warrant supported by probable cause before acquiring" CSLI specific to a defendant's cell phone. *Id*. at _; 138 S. Ct. at 2221. However, the Court also explicitly stated that it was not expressing a view on information gathered from cell phone "tower dumps," being "a download of information on all devices that connected to a particular cell site during a particular interval." *Id*. at _; 138 S. Ct. at 2220.

On remand from the Supreme Court in *United States v. Carpenter*, 926 F.3d 313, 318 (C.A. 6, 2019), vacated in part on other grounds, 788 Fed. Appx. 364 (C.A. 6, 2019), the Sixth Circuit determined that suppression of the CSLI gathered in that case was not required because the agents had in good faith relied on the Stored Communications Act when they obtained the data without a warrant. This holding is in accord with the principle that the purpose of the exclusionary rule, being the deterrence of police misconduct, is not served when the police acted in good faith in accordance with constitutional standards that prevailed at that time. *Goldston*, 470 Mich. at 526; *see also Davis v. United States*, 564 U.S. 229, 231; 131 S. Ct. 2419; 180 L. Ed. 2d 285 (2011) (extending the good-faith exception to the exclusionary rule when police conduct in a search complied with binding precedent later overruled).

In this case, we likewise find that the police acted in good faith when obtaining information regarding defendant's cell phone as

part of the "tower dump." Here, when police in 2009 obtained information from a "tower dump" of certain cell phone towers at the times relevant to Kelly's disappearance, they did so with a court order under the Stored Communications Act, which was not considered to be improper conduct under existing precedent. Indeed, even now this conduct has not been determined to be inappropriate, as the Supreme Court in *Carpenter* specifically declined to extend its holding to information obtained by police through a "tower dump." We also decline to do so here. We therefore conclude that the trial court did not err when it denied defendant's motion to suppress her inculpatory statements made after police revealed information to her they had gleaned from the tower dump.

To the extent that defendant contends on appeal that her cell phone billing records led to the police discovering the information that she called Billy Graham's hotline and using that information while interviewing her, we note that defendant failed to properly preserve this issue by specifically raising it before the trial court. We therefore review this issue for plain error affecting defendant's substantial rights, *Carines*, 460 Mich. at 763, and conclude that this issue is without merit. In *Carpenter*, the Supreme Court did not determine the constitutionality of obtaining a defendant's cell phone billing records without a warrant, *see Carpenter*, _ U.S. at _; 138 S. Ct. at 2234 (KENNEDY, J., dissenting), which differ from locational records. The holding in *Carpenter* was bound in an expectation of privacy in locational information. Because defendant points to no binding precedent to support her contention that her Fourth Amendment rights were violated with respect to the billing records, we find no error affecting defendant's substantial rights.

*Id.* at *4-6.

The state court's denial of relief is neither contrary to Supreme Court

precedent nor an unreasonable application of federal law or the facts.   It is

17

well-settled that federal courts will not address a Fourth Amendment claim on habeas review if the petitioner had a full and fair opportunity to litigate the claim in state court and the presentation of the claim was not thwarted by a failure of the State's corrective process.   *See Stone v. Powell*, 428 U.S. 465, 494-495 (1976).   This rule extends to a claim that a statement taken from a petitioner violates the Fourth Amendment because it was the fruit of an illegal arrest or search.   *See Cardwell v. Taylor*, 461 U.S. 571, 572-573 (1983) (per curiam).   A court must perform two distinct inquiries when determining whether a petitioner may raise a Fourth Amendment claim in a habeas action.   First, the court must determine "whether the state procedural mechanism, in the abstract, presents the opportunity" to raise a Fourth Amendment claim.   Second, the court must determine "whether presentation of the claim was in fact frustrated because of a failure of that mechanism."   *Machacek v. Hofbauer*, 213 F.3d 947, 952 (6th Cir. 2000) (quoting *Riley v. Gray*, 674 F.2d 522 (6th Cir. 1982)).

Michigan has a procedural mechanism which presents "an adequate opportunity for a criminal defendant to raise a Fourth Amendment claim." *Robinson v. Jackson*, 366 F. Supp. 2d 524, 527 (E.D. Mich. 2005).   This procedural mechanism is a motion to suppress, ordinarily filed before trial.

18

*See People v. Ferguson*, 376 Mich. 90, 93-94, 135 N.W.2d 357, 358-359 (1965) (describing the availability of a pre-trial motion to suppress); *see also People v. Harris*, 95 Mich. App. 507, 509, 291 N.W.2d 97, 99 (1980) (analyzing the legality of a warrantless search, seizure, and arrest even though raised for the first time on appeal).

Consequently, Petitioner is entitled to relief on this claim only if she shows that she was prevented from litigating the Fourth Amendment issue by a failure of Michigan's procedural mechanism.   Petitioner makes no such showing.   Rather, the record indicates that she had the opportunity to raise, and did raise, an illegal search claim before the trial court via a motion to suppress and that she also raised the claim on direct appeal and was denied relief.   Consequently, her Fourth Amendment claim is not cognizable on federal habeas review pursuant to *Stone v. Powell*.

Petitioner contends that her claim is not totally precluded by *Stone v. Powell* because she also asserts a violation of her Fifth Amendment rights. A claim that a confession was obtained in violation of a defendant's *Miranda* rights or was involuntary under the Fifth Amendment is not barred by *Stone v. Powell*.   *See, e.g., Withrow v. Williams*, 507 U.S. 680, 683, 688-685 (1993).   Petitioner, however, has not briefed her Fifth Amendment claim as

a distinct issue from her Fourth Amendment claim in the proceedings before this Court.   As such, she has waived her Fifth Amendment claim.   *See McCray v. Metrish*, 232 F. App'x 469, 478 (6th Cir. 2007) (finding un-briefed Fifth Amendment claim to be waived and refusing to address it).

Nonetheless, to the extent that Petitioner asserts that the trial court failed to suppress the police statements admitted at her second trial in violation of her Fifth Amendment rights, her argument "is more accurately brought pursuant to the Fourth Amendment" because she sought exclusion of those statements based upon them being the fruit of the allegedly unlawful search and seizure of her cell phone records.   *See United States v. Stepp*, 680 F.3d 651, 667 (6th Cir. 2012).[1]   A claim that a confession was tainted by an illegal search and should have been excluded is a claim based on the Fourth Amendment, and such a claim fails under *Stone v. Powell*.   *Cardwell*, 461 U.S. at 572-573 (discussing difference between Fourth and Fifth Amendment claims, holding that *Stone* barred claim that confession was inadmissible as fruit of illegal search, and explaining that "[o]nly if the

---

[1]It is well-settled that confessions made after police confront a suspect with evidence obtained through an illegal search and seizure are the fruits of the poisonous tree and must be suppressed.   *Wong Sun v. United States*, 371 U.S. 471, 484-485 (1963).   "The *Wong Sun* doctrine applies ... when the fruit of a Fourth Amendment violation is a confession."   *Oregon v. Elstad*, 470 U.S. 298, 306 (1985).

statements were involuntary, and therefore in violation of the Fifth Amendment, could the federal court grant relief on collateral review"); *see also Machacek*, 213 F.3d at 952 (illegal arrest context).   Petitioner does not allege any facts which show that the police statements admitted at her second trial were involuntary (other than the illegal search argument) so as to fall within the purview of the Fifth Amendment privilege against self-incrimination.   Consequently, her claim is properly characterized as a Fourth Amendment claim -- and is precluded by *Stone v. Powell*.

Lastly, even if *Stone v. Powell* does not preclude federal review of Petitioner's claim, she is still not entitled to habeas relief because her claim lacks merit.   As fully explained by Respondent, *see* Resp. Ans., ECF No. 7, PageID.129-143, Petitioner fails to establish that the Michigan Court of Appeals' decision is contrary to Supreme Court precedent or an unreasonable application of federal law or the facts.   Habeas relief is not warranted.

## V.    Conclusion

For the reasons stated, the Court concludes that Petitioner is not entitled to federal habeas relief.   Accordingly, the Court **DENIES** and **DISMISSES WITH PREJUDICE** the petition for a writ of habeas corpus.

Before Petitioner may appeal this decision, a certificate of appealability must issue. *See* 28 U.S.C. § 2253(c)(1)(a); Fed. R. App. P. 22(b). A certificate of appealability may issue only if the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). When a court denies relief on the merits, the substantial showing threshold is met if the petitioner demonstrates that reasonable jurists would find the court's assessment of the constitutional claims debatable or wrong. *Slack v. McDaniel*, 529 U.S. 473, 484-485 (2000). "A petitioner satisfies this standard by demonstrating that ... jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). When a court denies relief on procedural grounds, a certificate of appealability should issue if it is shown that jurists of reason would find it debatable whether the petitioner states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the court was correct in its procedural ruling. *Slack*, 529 U.S. at 484-485. Petitioner makes no such showing. Accordingly, the Court **DENIES** a certificate of appealability.

Lastly, the Court concludes that an appeal from this decision cannot be taken in good faith.   *See* Fed. R. App. P. 24(a).   The Court **DENIES** Petitioner leave to proceed in forma pauperis on appeal.   This case is closed.

**IT IS SO ORDERED**.

s/Denise Page Hood
DENISE PAGE HOOD
United States District Judge

Dated:   July 9, 2024